UNITED STATES DISTRICT COURT            <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
AJAY PATHANIA,

                               Plaintiff,            **MEMORANDUM**
        -against-                                 **AND ORDER**
                                               CV–11–2119 (JMA)
METROPOLITAN MUSEUM OF ART,

                               Defendant.
-----------------------------------------------------------------------X

APPEARANCES:

       Stewart Lee Karlin
       The Law Offices of Stewart Lee Karlin, P.C.
       9 Murray Street, Suite 4W
       New York, NY 10007
       *Attorney for Plaintiff*

       Richard Harris Block
       Jessica Wescott Catlow
       Mintz Levin Cohn Ferris Glovsky & Popeo PC
       666 Third Avenue
       New York, NY 10017
       *Attorneys for Defendant Metropolitan Museum of Art*

**AZRACK, United States Magistrate Judge**:

On July 27, 2012, plaintiff Ajay Pathania ("plaintiff") and defendant Metropolitan Museum of Art (the "Museum") consented to my conducting all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings. ECF No. 29. Now before me is the Museum's motion for summary judgment, in which the Museum argues that no genuine issue of material fact remains as to plaintiff's claims for (1) violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and (2) breach of the Collective Bargaining Agreement (CBA) between the Museum and District Council 37 (Local 1503) (the "Union"), and that those

claims fail as a matter of law.  For the reasons discussed in this memorandum, the Court grants the Museum's motion as to plaintiff's claims of discrimination in violation of Title VII, retaliatory termination in violation of Title VII, and breach of the CBA, but denies the Museum's motion as to plaintiff's claim of retaliatory deprivation of overtime work in violation of Title VII.

## I.     BACKGROUND

### A.  Procedural History

On April 5, 2011, plaintiff, a former Museum employee and Union member, filed an amended complaint (the "Complaint") in New York State Supreme Court, Richmond County, against the Museum and the Union.  Compl., Pathania v. Dist. Council 37, No. 101485/2011 (N.Y. Sup. Ct. Richmond Cty.), ECF No. 1.  At the time, plaintiff was *pro se*.  In his Complaint, plaintiff alleges that the Museum and the Union (i) discriminated against him based on his national origin, in violation of Title VII, Compl. ¶¶ 4, 8, 10–11; (ii) retaliated against him for complaining about discrimination, also in violation of Title VII, id. ¶¶ 4, 6–7, 10–11; and (iii) breached the CBA between the Museum and the Union.  Id. ¶¶ 8–9; McDowell Decl. Supp. Mot. Summ. J. ("McDowell Decl.") Ex. B, ECF No. 22.

The Museum filed a Notice of Removal to this Court on April 29, 2011.  ECF No. 1.  The Union moved in State court to dismiss the Complaint and did not join in the Museum's Notice of Removal.  On June 23, 2011, the Honorable Philip Minardo granted the Union's motion and dismissed the Complaint against the Union with prejudice.  Order, Pathania v. Dist. Council 37, No. 101485/2011 (N.Y. Sup. Ct. Richmond Cty. June 23, 2011).

On January 3, 2012, attorney Stuart Karlin filed a Notice of Appearance stating that he would be representing plaintiff.  ECF No. 11.  Plaintiff did not amend the Complaint after obtaining counsel.  On June 27, 2012, the Museum filed the instant summary judgment motion,

ECF Nos. 17–22, 25–28, 30–31, 34–37, 39–41, and on July 27, 2012, plaintiff and the Museum consented to my conducting all proceedings in this case, including entering final judgment.

On January 15, 2013, plaintiff filed a notice requesting that the Clerk of the Court correct the caption to reflect that the Union is not a party to this action.  ECF No. 32.  On January 22, 2013, the Museum consented to plaintiff's request, and I directed the Clerk of the Court to terminate the Union as a party.  ECF No. 33.  On February 13, 2013, I entered an order amending the caption to reflect the Union's termination from the case.

### B. Plaintiff's Employment at the Museum

Plaintiff, an individual of Indian descent, is a former "Maintainer" in the Museum's Plumbing Shop, which is part of the Museum's Buildings Department.  McDowell Decl. ¶ 26. The Museum originally hired Plaintiff to work from 1:00 PM to 9:00 PM, Tuesday through Saturday.   Suppl. Decl. James Noone Supp. Mot. Summ. J. ("Noone Suppl. Decl.") ¶ 5, Ex. A, ECF No. 37.  However, for a brief period before December 4, 2007, plaintiff worked from 3:00 PM to 11:00 PM on Tuesday through Friday and from 1:00 PM to 9:00 PM on Saturday.  Id.  As of December 4, 2007, plaintiff worked from 1:00 PM to 9:00 PM, Monday through Saturday.  Id.

### 1. Plaintiff's October 9, 2007 Complaint to the Museum

On October 9, 2007, after making several verbal complaints that employees were smoking in the Plumbing Shop, plaintiff addressed a written complaint to the Museum's Human Resources department; Debra A. McDowell, the Museum's Vice President for Human Resources; Debroah Gul Haffner, the Museum's Environmental Health and Safety Manager; and James Noone, the Museum's Manager of Employee Relations/Labor Relations, alleging that employees were smoking in the Plumbing Shop, which affected plaintiff's breathing.  October 9,

2007 complaint ("10/9/07 Complaint" or "10/9/07 Compl."), Block Decl. Supp. Mot. Summ J. ("Block Decl.") Ex. D, ECF No. 21; Pl. Dep. 14:17–22, 15:8–16:8, 11/22/11.  Plaintiff is allergic to smoke.  Pl. Decl. Opp'n Mot. Summ. J. ("Pl. Decl.") ¶ 4, ECF No. 26.  In addition, plaintiff alleged that he had made verbal complaints concerning the smoking to Plumbing Shop supervisor Edward Monuszko, and that Monuszko later called him a "rat" and a "cabdriver."  Pl. Dep. 16:9–15, 11/22/11; 10/9/07 Compl.  This was the first time plaintiff informed Human Resources of Monuszko's comments.  Pl. Dep. 22:11–15, 11/22/11.

Plaintiff interpreted "cab driver" as discriminatory because "all the Indian people, they drive cabs."  Id. 19:3–4.

Plaintiff testified that on one occasion, when he attempted to accompany Monuszko to a job, Monuszko said "no we don't want rats coming with us."  Id. 16:24–17:2.  Plaintiff further testified that "They wrote it down, this was posted, memo was posted.  They wrote it down on every board I'm a rat."  Id. 17:3–5.  Plaintiff's interpretation of what Monuszko meant by "rat" is "Rat meaning you ratting us out.  Why you complaining?  We're here for 17 years doing whatever we want."  Id. 17:17–21.

Upon receiving plaintiff's 10/9/07 Complaint, Noone began an investigation.  Noone Decl. Supp. Mot. Summ J. ("Noone Decl.") ¶¶ 4–5, ECF No. 20.  Monuszko denied calling plaintiff a "rat" or a "cabdriver."  Id. ¶ 5.  The record contains contradictory statements about whether Noone interviewed Richard Kletzky, a Caucasian who worked as an Assistant Maintainer in the Plumbing Shop and may have witnessed Monuszko's comments.  Noone states that he interviewed Kletzky, who denied ever hearing Monuszko or anybody else at the Museum make the comments.  Id. ¶ 6.  Kletzky, in contrast, states that Noone never approached, interviewed, or interrogated him "regarding any indoor smoking related violation or

investigation."  June 20, 2010 letter from plaintiff to Jeanette M. Jimenez App'x B, Suppl. Decl. of Richard H. Block Supp. Mot. Summ. J. ("Block Suppl. Decl.") Ex. B, ECF No. 36.  Noone nevertheless warned Monuszko that making such comments was prohibited and could lead to disciplinary action.  Noone Decl. ¶ 5.

Plaintiff testified that Monuszko commented that Indians "blow up buildings" and made numerous other, unspecified, discriminatory comments when nobody else was present.  Pl. Decl. ¶¶ 10–11; Pl. Dep. 19:20–25, 28:11–16, 11/22/11.  When asked how many times Monuszko said something discriminatory to him, plaintiff testified, "Anytime he sees me alone . . . . Every time he see in the evening, he just pass comments."  Pl. Dep. 28:11–16, 11/22/11. Plaintiff never reported the comment about blowing up buildings, or any additional comments, to Museum management.  Id. 19:20–25.

### 2.  Plaintiff's April 21, 2008 Complaint to the Museum

On April 21, 2008, plaintiff filed another written complaint, this time with Michael Gillmartin, the Museum's Chief Engineer, alleging that Monuszko was retaliating against plaintiff for filing the 10/9/07 Complaint.  April 21, 2008 complaint ("4/21/08 Complaint" or "4/21/08 Compl."), Block Decl. Ex. E; Pl. Dep. 29:3–13, 11/22/11.  Plaintiff alleges in the 4/21/08 Complaint that:   (1) After he filed the 10/9/07 Complaint, Monuszko assigned him "very little to no[]" overtime work while assigning others more overtime work; (2) On October 18, 2007, Monuszko, Kletzky, and Mike Playas each logged approximately 7.5 overtime hours, whereas plaintiff was offered only three overtime hours; (3) On January 7, 2008, Monuszko offered overtime hours to Playas but not to plaintiff; (4) On February 2, 2008, Rawle Campbell, who was a "helper" and not a Maintainer, was asked to cover for Maintainer Frank Pizzolo, even though it would have been more appropriate to offer the overtime to plaintiff because plaintiff

was a Maintainer; (5) On April 16, 2008, Monuszko awarded Pizzolo ten hours of overtime during plaintiff's shift; (6) Plaintiff "felt isolated from the rest of the shop" because Monuszko was "giv[ing] me the silent treatment which has created a very uncomfortable working environment"; and (7) On April 6, 2008, after a Union representative contacted Monuszko regarding plaintiff's "overtime matter," Monuszko asked plaintiff why he was escalating matters to the Union, accused plaintiff of trying to take away Monuszko's overtime hours, and stated that as the one wearing the "white shirt," Monuszko could do overtime whenever he wanted.  4/21/08 Compl.; see also Pl. Decl. ¶ 9; Suppl. Pl. Decl. Opp'n Mot. Summ. J. ("Pl. Suppl. Decl.") ¶¶ 9, 12, 13, 15, ECF No. 41.

When asked why plaintiff found Monuszko's comment about wearing a "white shirt" discriminatory, plaintiff stated he believed Monuszko was saying "You can't do nothing to me . . . . You can't do absolutely nothing to me . . . . I'm the one wearing white shirt, I can do whatever I want." Pl. Dep. 30:8–16, 11/22/11.

In his 4/21/08 Complaint, plaintiff also includes a chart of unknown origin, titled "Average Weekly overtime booked," which, without specifying any particular time period, states that plaintiff's average was three hours, whereas Monuszko, Playa, Pizzolo, and Kletzky's averages were thirty, fifteen, fifteen, and twenty-two hours, respectively, and that Campbell had declined several overtime offers.  4/21/08 Compl. at 2.  If plaintiff created this chart himself, he provides no basis for his personal knowledge as to other employees' weekly overtime averages.

The record contains no evidence concerning how the Museum responded to plaintiff's 4/21/08 Complaint.

Plaintiff also testified that Monuszko phoned him and said, "Let me give you some advice.  I'm the one who run the show here, you always remember that," and plaintiff found this

discriminatory "because he threaten me all the time, nobody else.  All the white guys stay on the side."  Pl. Dep. 33:13–20, 11/22/11.  Plaintiff never reported this phone call to management and does not specify when it occurred.  When asked if he believes Monuszko would have done this if plaintiff had not filed "the complaint about the smoking policy," plaintiff responded, "[N]o, I don't think so.  He just retaliate because he is mad."  Id. 33:21–25.

### 3.  Plaintiff's Verbal Complaints in 2008 and 2009 to Supervisor David Gomez

Plaintiff did not file any additional complaints with the Museum that explicitly alleged discrimination or retaliation.  However, he testified that throughout 2008 and 2009, he "occasionally" told supervisor David Gomez that Monuszko "continued to retaliate against me because I complained about derogatory and discriminatory comments and that he continued to make discriminatory comments."  Pl. Decl. ¶ 12.  Plaintiff does not specify when in 2008 and 2009 he made these verbal complaints to Gomez, what retaliation and discriminatory comments he reported to Gomez, or how Gomez responded.

### 4.  Plaintiff's Grievance Forms in 2008 and 2009 Concerning Overtime Denial

In 2008, plaintiff filed three grievance forms with Gomez, "Management," and the Union alleging that plaintiff was deprived of overtime hours on May 31, June 22, and November 4 and 11 of that year and requesting that the Museum pay him for those lost hours.  June 20, 2010 letter from plaintiff to Jeanette Jimenez ("6/20/10 Letter") App'x F, Block Suppl. Decl. Ex. B App'x F.  In the first form, dated May 31, 2008, plaintiff alleges that on that date, a Saturday, Monuszko should have awarded plaintiff overtime work from 8:00 AM to 1:00 PM "based on the low-man asked first procedure" but, instead, assigned the work to Pizzolo.  Id.  In the second form, dated June 29, 2008, plaintiff alleges that on Sunday June 22, 2008, Monuszko should have awarded plaintiff overtime work from 8:00 AM to 4:00 PM "based on the low man asked

first procedure" but, instead, assigned the work to Playas.  Id.  In the third form, dated November 11, 2008, plaintiff alleges that on Tuesday, November 4, 2008 and Tuesday, November 11, 2008, he "was not allowed to cover [plaintiff's] shift after he volunteered to work by signing the posted overtime sheet, posted by management."  Id.  Plaintiff does not expressly allege in any of these forms that anybody is discriminating or retaliating against him.

On the first two grievance forms, Gomez wrote that the grievance "IS DENIED AFTER BEING INSTRUCTED BY MANAGEMENT THAT THE UNION IS NOT RECOGNIZING THIS FORM AND THAT IT SHOULD BE CONSIDERED FRIVOLOUS."  Id.  The record does not reflect whether these grievances were actually frivolous.  Nor does the record contain definitive evidence about how the Museum or the Union responded to the grievance concerning November 4 and 11, 2008, though plaintiff alleges in an October 16, 2009 letter to the Equal Employment Opportunities Commission (EEOC) that "Multiple grievances were filed by my union representative . . . with the museum and all of them were either denied or never responded," October 16, 2009 letter from plaintiff to EEOC ("10/16/09 Letter"), Block Suppl. Decl. Ex. A at 3.

In 2009, plaintiff filed three more grievance forms alleging that he was deprived of overtime hours on January 19, May 16, and June 7 of that year and requesting that the Museum nevertheless pay him for those hours.  See Pl. Suppl. Decl. Ex. A.  Plaintiff filed the first form, dated January 20, 2009, with Gomez, "Management," and the Union, alleging that although plaintiff had "signed up" to work holiday overtime hours the previous day and had "the least amount of overtime hours," someone with more overtime hours than plaintiff received the assignment.  Id.  Plaintiff filed the second form, dated May 19, 2009, with Gene Mianti, "Management," and the Union, alleging that plaintiff "[w]as not called in to cover 8 AM to 1

PM" on Saturday, May 16, 2009.  Id.  Plaintiff filed the third form, dated June 9, 2009, with Gomez, "Management," and the Union, alleging that because "[overtime] was not posted" for Sunday, June 7, 2009, plaintiff "was not afforded the opportunity to work," and someone from outside the Plumbing Shop received the assignment instead of plaintiff.  Id.  Plaintiff neither names Monuszko nor expressly alleges discrimination or retaliation in any of these forms.  The record does not reflect whether anybody at the Museum or the Union responded to these forms.

Plaintiff states that he was "continually denied overtime and was denied overtime up to about my termination date."  Pl. Suppl. Decl. ¶ 13.

The parties dispute whether Monuszko had any discretion in granting overtime assignments.  Id. ¶ 15, Noone Suppl. Decl. ¶ 11.

### C. **Layoffs at the Museum**

#### 1. **The Museum's Negotiations With the Union**

In approximately November 2008, the Museum began to face financial hardship. McDowell Decl. ¶ 3; McDowell Dep. 21:22–22:7, 5/22/12.  As a result, the Museum was forced to reduce the size of its operating budget by, among other things, reducing the number of Museum employees.  McDowell Decl. ¶¶ 3–4.  Before reducing its staff, the Museum employed approximately 807 Union members and approximately 1,704 non-Union members.  Id. ¶ 4.  The Museum began by placing a hiring freeze on 80 vacant, non-Union positions.  Id. ¶ 5.  Next, the Museum reviewed all non-Union and Union positions to determine which positions the Museum could eliminate without adversely affecting its collection, visitors, and general operations.  Id. ¶¶ 5–6.  The Museum laid off a group of 257 non-Union members and, in February 2009, a group of eleven probationary employees who were not yet eligible for Union membership.  Id. ¶¶ 8–9.

In late 2008 and early 2009, the Museum began assessing the best way to reduce the number of Union employees.  Id. ¶ 12.  Most of the Museum's Union employees worked in the Museum's Buildings Department or Security Department.  Id. ¶ 14.  Several "shops" comprise the Buildings Department (for example, the Custodial, Elevator, Plumbing, and Vehicle Shops), each of which generally requires a different skill set and/or license.  Id. ¶¶ 14–15; Facilities Special Skills/Licensure Title List, McDowell Decl. Ex. C; McDowell Dep. 24:18–25:11, 5/22/12.  For example, employees in the Carpentry Shop must have carpentry and woodworking skills and pass a practical test; employees in the Elevator Shop must have elevator repair and maintenance skills and pass a practical test; employees in the Plumbing Shop must have plumbing repair and maintenance skills and pass a practical test; and employees in the Drivers Shop must have a commercial driver's license.  McDowell Decl. Ex. C.  Employees in one shop are not trained to perform other shops' employees' duties.  July 21, 2009 letter from Chris Wilgenkamp to plaintiff ("6/21/09 Letter"), Catlow Decl. Supp. Mot. Summ. J. ("Catlow Decl.") Ex. B, ECF No. 31.  All individuals who work in the Buildings Department have the title of Maintainer or Assistant Maintainer, regardless of the shops in which they work.  McDowell Decl. ¶ 14.

The CBA provides that

> In the event of any layoffs of employees due to a reduction of staff, those   employees within the particular department, i.e., the Security Department, the Buildings Department on in the title of Departmental Technician, Senior Departmental Technician, who were hired last shall be laid off first, and rehiring shall be in reverse order within the particular department or title.

CBA Art. XV(2).

Beginning in approximately February 2009, the Museum negotiated with the Union concerning the impact of laying off Union members.  McDowell Decl. ¶ 16; McDowell Dep.

22:8–20, 5/22/12.   Noone and McDowell represented the Museum in the negotiations. McDowell Decl. ¶ 17.

At the end of that month, plaintiff lost an election for the position of Shop Steward.  See Karlin Decl. Opp'n Mot. Summ. J. ("Karlin Decl.") Ex. 8, ECF No. 25.  On March 3, 2009, plaintiff wrote a letter to Mike Riggio, Director of the Union's White Collar Division, contesting the election results on the grounds that the voting administrators had prohibited late-shift employees from voting.  Id.   The letter annexes a petition that several Museum employees signed.  Id.  The record is unclear as to whether, or how, the Union responded to plaintiff's contest.

Meanwhile, the Museum and the Union continued their negotiations concerning the impact of laying off Union employees.  In selecting employees for layoffs, the Museum sought not to impact the galleries, and to retain employees with certain skill sets.  McDowell Decl. ¶ 18. The Museum communicated to the Union that the Museum's priorities were to continue providing a high level of security, to maintain the Museum's facilities so that it could maintain its status as a world-class institution, and to be able to fulfill the Museum's commitments concerning exhibitions and programs.  Id. ¶ 13; McDowell Dep. 23:20–24:9, 5/22/12.

The Museum informed the Union that to further these priorities, it was considering terminating Union employees in the Security Department and in the Buildings Department's Custodial, Elevator, Plaza Pool, and Vehicle Shops, as well as Departmental Technicians. McDowell Decl. ¶ 18.  The Museum also proposed placing a hiring freeze on vacant Union positions.  Id.

During the negotiations, the Museum and the Union never discussed the employees' personal characteristics, such as their races, national origins, or complaint histories.  Id. ¶ 25.

### 2.   Layoffs in the Buildings Department

In considering which Buildings Department employees to lay off, the Museum, with the Union's agreement, considered seniority within the individual shops, but not within the entire Buildings Department.  See id. ¶ 24; Roster dated March 26, 2009 ("3/26/09 Roster"), Karlin Decl. Ex. 2.

In making these seniority determinations, the Museum and the Union disagreed over whether the Plaza Pool was a shop in its own right or part of the Plumbing Shop.  See McDowell Decl. ¶ 21.

Historically, the Museum's Finance and Human Resources departments had not considered the Plaza Pool its own shop, even though the Plaza Pool was "separated in function, in location, in [overtime], and on [the Museum's] website."  Potential Plaza Pool/Plumber Changes, McDowell Decl. ¶ 19, Ex. E.  Nevertheless, the Museum proposed eliminating the Plaza Pool Shop entirely and shifting its responsibilities to other shops, id. ¶ 21, such that the Plumbing Shop would begin "repair[ing] all pumps, filters, drains and mechanical elements and treat[ing] the water" in fountains the Plaza Pool Shop had previously serviced; the Horticulture Shop would begin cleaning those fountains; the Custodial Shop would begin moving benches in and out of the Museum  and "maintain[ing], repair[ing], and operat[ing] the tractors used for snow removal"; and the Carpentry Shop would begin repairing the plaza benches.  Id. Ex. E. The Union, however, insisted, in keeping with the historical view, that the Plaza Pool employees were part of the Plumbing Shop because they were plumbers.  Id. ¶ 21; McDowell Dep. 27:8–15; 6/21/09 Letter.   The Museum agreed to this demand and reached an agreement with the Union concerning which departments and shops the layoffs would impact.  McDowell Decl. ¶ 22; McDowell Dep. 27:24–28:4, 30:13–15.

The Plumbing Shop, interpreted to include the Plaza Pool, contained a total of seven employees, of whom plaintiff and Kletzky were the most junior.  McDowell Decl. ¶¶ 22, 26; 3/26/09 Roster.  As of March 26, 2009, plaintiff and Kletzky each had 2.5 years of seniority. 3/26/09 Roster.  The other Plumbing Department employees were four Maintainers with seniority ranging from 7.5 to 22.3 years, an Assistant Maintainer with seniority of 9.9 years, and Monuszko, who had seniority of 16.5 years.  Id.

While plaintiff, along with Kletzky, was the most junior in the Plumbing Shop, he was not the most junior in the entire Buildings Department.  See id.  However, because the Museum and Union assessed seniority by shop instead of by department, the Museum did not lay off several employees from other shops who had less seniority than plaintiff.  See id.

With the Union's agreement, the Museum selected for layoff the two most junior employees in the Plumbing Shop, as interpreted to include the Plaza Pool (plaintiff and Kletzky), sixteen employees in the Security Department, two employees in the Elevator Shop (one of whom opted for early retirement), and one Departmental Technician in the Image Library. McDowell Decl. ¶ 23; June 4, 2009 letter from McDowell to AFSCME, McDowell Decl. Ex. F. The Museum and the Union made their agreement without ever discussing or considering the employees' national origins.  McDowell Decl. ¶ 24.

The Museum laid plaintiff off on either June 9, 2009 or June 16, 2009.  See id. ¶ 26; Pl. Decl. ¶ 2; October 30, 2009 letter from National Labor Relations Board (NLRB) Regional Director Celeste J. Mattina to plaintiff ("10/30/09 Letter"), Block Decl. Ex. G.

Plaintiff admits that Monuszko played no role in the Museum's decision to terminate him.  McDowell Decl. ¶ 27; Pl.'s Response to Def.'s Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 60, 74, ECF No. 27.  Plaintiff also admits that as a Union employee, Monuszko did not have the

power to hire, fire, or set terms or conditions of employment for any Museum employee.  Pl.'s 56.1 ¶¶ 60–61.

Plaintiff believes the Museum terminated him because "I'm the only one complaining in the entire Building Department," Pl. Dep. 39:8–10, 11/22/11, and he believes his termination was discriminatory "[b]ecause I'm the only Indian guy in the Building Department let go."  Id. 43:5–8.

### D.  **Plaintiff's Complaints to the Union, NLRB, and EEOC**

On June 19, 2009, plaintiff requested that the Union pursue a grievance on his behalf.  Pl. Dep. 48:12–15, 11/22/11; Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 83, ECF No. 19; 10/30/09 Letter.   The Union reviewed plaintiff's grievance and confirmed its earlier determination that the Museum had terminated plaintiff properly.  10/30/09 Letter.  On July 21, 2009, Chris Wilgenkamp, Assistant Director of the Union's White Collar Division, sent plaintiff a letter stating that the Union and Museum's agreement reflected that the members of the Buildings Department's shops "have not been cross[-]trained to work in other shops," and that the Union, along with its Legal Department, believed that "seniority has been respected and layoffs conform with the terms of the [CBA]."  6/21/09 Letter at 2.

Plaintiff then filed an unfair labor practice charge with Region 2 of the NLRB alleging that the Union had violated Section 8(b)(1)(A) of the National Labor Relations Act (NLRA) by refusing to file a grievance on his behalf.  Def.'s 56.1 ¶ 85; see 10/30/09 Letter.  The NLRB dismissed the charge, finding that the Union had (1) deemed plaintiff's layoff proper while negotiating with the Museum "according to the bargaining history and past practice between the [Museum] and the Union"; and (2) made its decision not to pursue plaintiff's grievance "based upon its good faith evaluation of the merits of your claim."  10/30/09 Letter.  Plaintiff appealed

NLRB Region 2's determination, and the NLRB Office of Appeals denied the appeal "substantially for the reasons set forth in the Regional Director's letter," stating that "It appears that the Union's decision was based upon a reasonable interpretation of the contract and motivated by an intent to protect the integrity of the unit."  February 4, 2010 letter from NLRB Office of Appeals to plaintiff, Block Decl. Ex. H.  Plaintiff then untimely requested that the NLRB Office of Appeals reconsider its determination, and after reviewing plaintiff's appeal de novo, the NLRB Office of Appeals confirmed its prior decision.  April 8, 2010 letter from NLRB Office of Appeals to plaintiff, McDowell Decl. Ex. I.

On October 16, 2009, plaintiff wrote the EEOC a letter "Re:  Discrimination Complaint" summarizing his grievances against the Museum.  10/16/09 Letter.  Both parties characterize this 10/16/09 Letter as a "supplemental" submission to the EEOC, rather than a formal charge.  Pl.'s Response to Defendant's Supplemental Rule 56.1 Statement ("Pl.'s Suppl. 56.1") ¶ 27, ECF No. 39.  In this letter, plaintiff states that he wishes to file charges against the Museum and the Union for nationality discrimination, retaliatory action, unfair labor practice, wrongful termination, and breach of contract.  10/16/09 Letter at 4.

Whether this letter contains allegations of overtime deprivation is not clear from its face.  In the letter, plaintiff states "5/21/2008; 6/29/08; 11/14/08; 12/19/08 (Appendix–H).  Multiple grievances were filed by my union representative . . . with the museum and all of them were either denied or never responded."  Id. at 3.  The letter does not specify the subject of these grievances, and the record does not contain the purported "Appendix–H."  In fact, plaintiff admits that he did not annex to the 10/16/09 Letter any evidence about his grievances.  Pl.'s Suppl. 56.1 ¶ 28.  In any event, the Museum concedes that plaintiff did "raise[] the overtime

issue" in this letter.  Def.'s Supplemental Rule 56.1 Statement ("Def.'s Suppl. 56.1") ¶ 27, ECF

No. 35.  Accordingly, the Court construes the 10/16/09 Letter as raising the overtime issue.

      In a notice dated November 2, 2009, the EEOC informed the Museum that plaintiff had

filed a charge of discrimination under the Americans with Disabilities Act (ADA) concerning

"Assignment, Discharge, Harassment, Seniority, Terms/Conditions, Representation, [and]

Wages."  November 2, 2009 Notice of Charge of Discrimination, EEOC Charge No. 520–2010–

00305 ("11/2/09 EEOC Notice of Charge"), Noone Suppl. Decl. Ex. B.  The record contains no

actual charge with the corresponding number 520–2010–00305.  The 11/2/09 Notice of Charge

does not indicate whether plaintiff filed any claims under Title VII, and plaintiff admits that the

charge itself "did not contain any allegations regarding the assignment of overtime hours to

him."  Pl.'s Suppl. 56.1 ¶ 26.

      On February 16, 2010, plaintiff filed another charge with the EEOC.  February 16, 2010

EEOC charge ("2/16/10 EEOC Charge") McDowell Decl. Ex. H at 3.  The cover page of the

charge, which is confusingly numbered 520–2009–0, states that plaintiff brings a charge against

the Museum for discrimination based on national origin and retaliation, and directs the reader to

"See attached" for details.  Id.  The next page is a narrative statement by plaintiff, confusingly

numbered 520–2010–00306, in which plaintiff alleges that his supervisor called him a "cab

driver" and "Rat"; that the Museum terminated plaintiff in retaliation for his protected activity

and medical condition; and that "I have been treated differently in the terms and conditions of

employment, retaliated and discharged because of my national origin as Indian, in violation[] of

Title VII."  Id.[1]  This charge does not contain a specific allegation that plaintiff was deprived of

overtime work.

---

[1] The Court assumes that despite this discrepancy in their numbering, the cover page and
narrative statement comprise one charge that plaintiff filed on February 16, 2010 because the

In another notice dated March 15, 2010, the EEOC informed the Museum that plaintiff had filed a charge against the Museum for discrimination in violation of the ADA, discrimination involving plaintiff's national origin, and retaliation.  See March 15, 2010 Notice of Charge of Discrimination, EEOC Charge No. 520–2010–00305 ("3/15/10 EEOC Notice of Charge"), McDowell Decl. Ex. H at 1.[2]

On June 20, 2010, plaintiff wrote the EEOC a letter "Re:  Charge # 520–2010–00305." 6/20/10 Letter.  Both parties characterize this 6/20/10 Letter as a "supplemental" submission to the EEOC, rather than a formal charge.  Pl.'s Suppl. 56.1 ¶ 27.  In the letter, plaintiff alleges that "my supervisor denied me to work overtime hours and had the same work performed by high ranking union officials from other shops," who were not plumbers, "as a favor from Mr. Manuszko [sic] to the fellow union members."  6/20/10 Letter.  The letter annexes copies of the three grievance forms plaintiff filed in 2008 concerning overtime.  Id. App'x F.

On January 28, 2011, the EEOC dismissed charge number 520–2010–00306 and issued plaintiff a "right-to-sue" letter.  Block Decl. Ex. F.

**E.  Reinstatement Rights**

The CBA provides that "rehiring shall be in reverse order within the particular department or title."  CBA Art. XV(2).  The CBA does not specify how long a laid-off employee's reinstatement rights shall last but provides that "[l]aid off employees reinstated from a Museum list within one year shall receive the salary, with any adjustments, as if they had never

EEOC received both pages on February 19, 2010, see McDowell Decl. Ex. H at 3–4; McDowell characterizes her entire Exhibit H as "a true and correct copy of the EEOC Charge received by the Museum," McDowell Decl. ¶ 29; and plaintiff does not dispute McDowell's characterization.

[2] Confusingly, the EEOC numbered this notice 520–2010–00305, which is the same number the EEOC assigned to the 11/2/09 EEOC Notice of Charge.  Nevertheless, the Court assumes that this 3/15/10 EEOC Notice of Charge pertains to the 2/16/10 EEOC Charge because McDowell characterizes her entire Exhibit H as "a true and correct copy of the EEOC Charge received by the Museum," McDowell Decl. ¶ 29, and plaintiff does not dispute McDowell's characterization.

been laid off."  CBA Art. XV(3).  However, an April 26, 2010 letter from Noone to AFSCME reflects Noone's understanding that the Museum and Union "agree" that reinstatement rights last one year, and "[a]t the expiration of that year, the Museum can resume hiring for union positions in accord with the [CBA] and established practice without regard to the reinstatement list."  April 26 letter from Noone to AFSCME, Karlin Decl. Ex. 9.  The record contains no evidence as to whether the Union responded to Noone's letter.

Plaintiff admits that as of the date of the instant summary judgment motion, the Museum has not replaced plaintiff or Kletzky in the Plumbing Shop, which still has only five employees. Pl.'s 56.1 ¶ 29; see McDowell Decl. ¶ 26.  However, plaintiff alleges that within six months of his layoff, the Museum hired three new employees in the Buildings Department's "engineering department," albeit not in the Plumbing Shop.  Pl. Decl. ¶ 22; Pl. Mem. Opp'n Mot. Summ. J. ("Pl. Br.") at 10, ECF No. 28.  In support of this assertion, plaintiff annexes a Seniority list dated May 21, 2009, on which he superimposes commentary that "Met hired three new union employees in building[] department" and an arrow pointing to the names of three employees whose seniority and shops are not listed.  Karlin Decl. Ex. 6.

## II.    DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is "proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  The moving party is entitled to judgment as a matter of law if "the nonmoving party . . . fail[s] to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof."  Id.  The substantive law of the action

determines which facts are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   In other words, summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."   Donnelly v. Greenburgh Cent. School Dist. No. 7,   691 F.3d 134, 141 (2d Cir. 2012) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).   In deciding a summary judgment motion, a court cannot credit a party's "merely speculative or conclusory assertions."   DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012);   see also Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) ("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion.") (quoting Davis v. N.Y., 316 F.3d 93, 100 (2d Cir. 2002)).   One of the primary purposes of the summary judgment rule is "to isolate and dispose of factually unsupported claims."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Trial courts should be cautious in granting summary judgment to an employer in an employment discrimination case because direct evidence of discriminatory intent is rare, and courts must often infer discriminatory intent from circumstantial evidence in affidavits and depositions.  See Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). However, "summary judgment remains available for the dismissal of discrimination claims lacking genuine issues of material fact."   Schiano v. Quality Payroll Systs., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997)); see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now

beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

**B.  Plaintiff's Discrimination Claim**

Title VII provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000-e2(a)(1).  Courts assess a plaintiff's substantive discrimination and retaliation claims using the burden-shifting framework the Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973); see Meiri v. Dacon, 759 F.2d 989, 995–98 (2d Cir. 1985).

Under this framework, the plaintiff must first offer evidence to establish a prima facie case of unlawful employment discrimination.  See McDonnell Douglas Corp., 411 U.S. at 802. This burden is not onerous. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  In considering whether the plaintiff has established his prima facie case, the court "presume[s] the[] [employer's] acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  Id. at 254 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

Once the plaintiff makes his prima facie case, a presumption of discrimination arises, and the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action.  McDonnell Douglas Corp., 411 U.S. at 802.  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  The employer must support this explanation with admissible evidence.  St. Mary's

Honor Ctr., 509 U.S. at 507 (quoting Burdine, 450 U.S. at 254–55 & n.8).  This burden, like the plaintiff's initial burden to establish a prima facie case, is not a demanding one.  Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir.1999) (citation omitted).

If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Id.

**1.  Plaintiff's Prima Facie Case**

To establish a prima facie case of termination based on national origin, plaintiff must show that (i) he belonged to a protected class, (ii) his job performance was satisfactory, (iii) he was discharged, and (iv) the circumstances surrounding his discharge give rise to an inference of discrimination.  See Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996).  "[T]here is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision."  Id. at 91.  "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations."  McDonnell Douglas Corp., 411 U.S. at 802 n.13.  The circumstances that give rise to an inference of discriminatory motive include "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus[;] preferential treatment given to employees outside the protected class"; a defendant's continuing after plaintiff's termination "to seek applicants to fill the position"; and, in a corporate downsizing, "the systematic transfer of a discharged employee's duties to other employees or a pattern of recommending the plaintiff for positions for which he . . . is not

qualified" or "failure to surface plaintiff's name for positions for which he . . . is well-qualified." Chertkova, 92 F.3d at 91 (citations omitted). A plaintiff might also "rely upon the timing or sequence of events leading to the plaintiff's termination." Id. (citation omitted).

Plaintiff alleges that the Museum terminated him on the basis of his national origin, in violation of Title VII. Compl. ¶¶ 4, 10; Pl. Dep. 43:2–8, 11/22/11. The parties do not dispute that plaintiff is a member of a protected class, that plaintiff was qualified to do his job, or that the Museum discharged him. They do, however, dispute whether the facts permit an inference of discrimination.

*i.*     *Monuszko's Alleged Statements*

"It is well settled that verbal comments may constitute evidence of discriminatory intent if the plaintiff can establish a nexus between the alleged discriminatory remarks and the defendant's decision to terminate the plaintiff's employment." Del Franco v. N.Y. City Off-Track Betting Corp., 429 F. Supp. 2d 529, 536 (E.D.N.Y. 2006) (citations omitted); see also Ahmad v. Nassau Health Care Corp., 234 F. Supp. 2d 185, 193 (E.D.N.Y. 2002) ("Verbal comments may constitute evidence of discrimination only when such comments are: (1) related to race, religion, and/or national origin; (2) 'proximate in time to the adverse employment decision'; (3) 'made by an individual with authority over the employment decision at issue'; and (4) 'related to the employment decision at issue.'"), aff'd, 71 Fed. Appx. 98 (2d Cir. 2003) (quoting Ruane v. Cont'l Cas. Co., No. 96–CV–7153, 1998 WL 292103, at *9 (S.D.N.Y. June 3, 1998).

Plaintiff states that Monuszko made several comments which plaintiff interprets as relating to plaintiff's Indian national origin. Specifically, plaintiff presents evidence that Monuszko (1) called him a "rat" and a "cabdriver," Pl. Dep. 16:9–15, 11/22/11; 10/9/07 Compl.;

(2) commented that Indians "blow up buildings," Pl. Decl. ¶ 10; Pl. Dep. 19:20–21, 28:11–16, 11/22/11; (3) stated that, as the one wearing the "white shirt," Monuszko could do overtime whenever he wanted, 4/21/08 Compl.; Pl. Dep. 30:8–16, 11/22/11; (4) phoned plaintiff and said, "Let me give you some advice. I'm the one who run the show here, you always remember that," Pl. Dep. 33:13–20, 11/22/11; and (5) made other, unspecified, discriminatory comments when nobody else was present. Id. 28:11–16; Pl. Decl. ¶ 11.

Plaintiff presents no argument, and the Court is aware of none, as to how "rat" relates to plaintiff's national origin. In fact, Plaintiff's admits that he interpreted "rat" to mean "[r]at meaning you ratting us out. Why you complaining? We're here for 17 years doing whatever we want." Id. 17:17–21, 11/22/11.

When asked why he considered Monuszko's alleged comment about a "white shirt" discriminatory, plaintiff responded that Monuszko was saying "You can't do absolutely nothing to me . . . . I'm the one wearing white shirt, I can do whatever I want." Pl. Dep. 30:8–16, 11/22/11. This interpretation does not explain how Monuszko's alleged comment was discriminatory. Nor does the record contain any evidence that the alleged comment had anything to do with plaintiff's Indian national origin.

Plaintiff asserts that Monuszko's comment to him on the telephone about "run[ning] the show" was discriminatory "because he threaten me all the time, nobody else. All the white guys stay on the side." Id. 33:13–20. However, the record contains no evidence that this was a threat, let alone a threat Monuszko made because of plaintiff's Indian origin. See Ahmad, 234 F. Supp. 2d at 193 (finding that alleged comment could not support prima facie claim under Title VII because they "did not even mention race, religion or nation origin, and it is unclear how, if at all, it related to [plaintiff's national] origin").

And while plaintiff alleges that Monuszko made other, unspecified, discriminatory comments when nobody else was present, plaintiff provides no evidence concerning what Monuszko allegedly said. Accordingly, the record contains no evidence that any of the alleged comments was discriminatory.

In contrast, plaintiff presents plausible arguments that two of Monuszko's alleged comments were discriminatory. Plaintiff interpreted the alleged "cab driver" comment as concerning plaintiff's Indian national origin because "all the Indian people, they drive cabs." Id. 19:3–4. Further, Monuszko's alleged comment that Indians blow up buildings was expressly derogatory to Indians.

However, the record contains no evidence that Monuszko made these alleged comments proximate to plaintiff's termination. The Museum terminated plaintiff in June 2009. Plaintiff reported Monuszko's alleged "rat" and "cab driver" comments in October 2007 and Monuszko's alleged "white shirt" comment in April 2008, over a year before plaintiff's termination. See, e.g., Del Franco, 429 F. Supp. 2d at 537 (finding that alleged discriminatory comments made slightly more than three months before plaintiff's termination "were not temporally related to plaintiff's eventual discharge"). And plaintiff provides no evidence that Monuszko made the other alleged comments proximate to plaintiff's termination. This "lack of specificity in time and place . . . cuts against Plaintiff's claims" of discrimination. Ahmad, 234 F. Supp. 2d at 194.

Most importantly, plaintiff admits that Monuszko played no role in the Museum's decision to terminate plaintiff's employment, McDowell Decl. ¶ 27; Pl.'s 56.1 ¶¶ 60–61, 74. Monuszko's alleged comments, therefore, "have no connection to the decision to terminate Plaintiff." Ahmad, 234 F. Supp. 2d at 194 (citation omitted); see also Taylor v. Abercrombie & Fitch Stores, Inc., No. 8–CV–4364, 2010 WL 4168631, at *2 (E.D.N.Y. Oct. 19, 2010)

("Statements made by non-decisionmakers do not give rise to an inference of discrimination.") (citing Del Franco, 429 F. Supp. 2d at 536–37).

Plaintiff also admits that the Museum never discussed or considered employees' national origins or races in deciding whom to terminate.  Pl.'s 56.1 ¶¶ 44–45; see McDowell Decl. ¶ 24. In fact, the record contains sworn testimony that the Museum's sole criterion for determining which Union employees to terminate was seniority by shop.  McDowell Decl. ¶¶ 24–25.

Accordingly, Monuszko's alleged comments do not permit an inference that the Museum's termination of plaintiff was discriminatory.

### ii.      The Museum's Alleged Replacement of Plaintiff

Plaintiff alleges that within six months of his layoff, the Museum hired three new employees in the Buildings Department, albeit not in the Plumbing Shop.  See Pl. Decl. ¶ 22; Pl. Br. at 10; Karlin Decl. Ex. 6; Pl.'s 56.1 ¶ 49.  Plaintiff makes this allegation in his declaration, purportedly on the basis of personal knowledge, though plaintiff does not name these alleged new employees in his declaration.  Pl. Decl. ¶ 22.  Plaintiff, however, admits that these alleged new employees do not work in the Plumbing Shop and, therefore, did not fill his position.  Id.  In fact, plaintiff admits that as of the date of the instant summary judgment motion, the Museum has not replaced him or Kletzky, and that the Plumbing Shop still has only five employees.  Pl.'s 56.1 ¶ 49; see also McDowell Decl. ¶ 26.

The record thus belies plaintiff's claim that the Museum replaced him within six months of his termination.

Accordingly, plaintiff fails to present a prima facie case that the Museum selected him for layoff based on his national origin.

## 2. The Museum Articulates a Legitimate, Non-Discriminatory Motive for Terminating Plaintiff

Even if plaintiff presented a prima facie case, his claim fails under the McDonnell Douglas burden-shifting framework because the Museum presents a legitimate, non-discriminatory motive for terminating plaintiff, which plaintiff cannot show is pretextual.

The Museum contends that financial hardship necessitated Museum-wide layoffs, and that once the Museum and the Union agreed upon which shops the layoffs would affect, the sole criterion for layoffs was reverse seniority by shop. See McDowell Decl. ¶ 24. In support of this contention, the Museum offers evidence in the form of McDowell's deposition and declaration, and a roster depicting seniority within the Plumbing Shop. See id. Ex. D.

Further, the record reflects that the Museum did not single out plaintiff but, rather, terminated him along with several non-Indians, including Kletzky. See Johnson v. Nicholson, No. 5–CV–2740, 2007 WL 1395546, at *7 (E.D.N.Y. May 11, 2007) (finding that defendant articulated a legitimate reason for challenged employment actions, where "[p]laintiff was not singled out").

## 3. Plaintiff Offers No Evidence that the Museum's Explanation is a Pretext for Discrimination

Plaintiff cannot demonstrate that the Museum's proffered explanation is a pretext for discrimination unless he shows that the Museum "was in fact motivated at least in part by the prohibited discriminatory animus." Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 156 (2d Cir. 2010) (citing Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff admits that as a result of financial hardship, in approximately November 2008, the Museum was forced to take steps to reduce its operating budget and headcount. Pl.'s 56.1 ¶¶ 1–3. Plaintiff admits that the Museum and the Union negotiated concerning the layoffs, that

the Union insisted the Museum consider the Plaza Pool employees part of the Plumbing Shop, and that once the Museum and the Union agreed upon which shops the layoffs would affect, the sole criterion for layoffs was reverse seniority by shop.  Id. ¶¶ 31–32, 39, 46.

Plaintiff testified that "I'm the only Indian guy in the Building[s] Department let go."  Pl. Dep. 43:5–8, 11/22/11.  Presumably plaintiff means that he was the only Indian employee in the Buildings Department, and not that he alone was fired from among several Indian employees in the Buildings Department.  Either way, the relevant question is whether the Museum laid plaintiff off *because* he is Indian, and plaintiff provides no evidence this was the case.  On the contrary, plaintiff admits that the Museum never discussed or considered employees' national origins or races in deciding whom to terminate.  Pl.'s 56.1 ¶¶ 44–45.

Plaintiff presents no evidence that discrimination was a motivating factor in the Museum's decision to terminate him.  Nor does he provide any "indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext."  Meiri, 759 F.2d at 998.  Accordingly, plaintiff has not produced sufficient probative evidence that the Museum's proffered reason for terminating him is pretextual.

For these reasons, no genuine issue of material fact exists concerning whether the Museum terminated plaintiff because of his national origin, and the Museum is entitled to summary judgment on plaintiff's claim that the Museum discriminated against him in violation of Title VII.

### C.  Plaintiff's Retaliation Claims

Title VII prohibits an employer from retaliating against an employee because the employee opposed the employer's potentially discriminatory practices.  See 42 U.S.C. § 2000e–3(a) (prohibiting an employer from discriminating against an employee or employment applicant

"because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter").

Courts analyze such retaliation claims using the McDonnell Douglas burden-shifting framework described above.  See Burdine, 450 U.S. at 252–54 (1981); Feingold v. N.Y., 366 F.3d 138, 157 (2d Cir. 2004).  If the plaintiff makes a prima facie case of prohibited retaliation, the burden shifts to the defendant to provide a legitimate, nonretaliatory reason for the challenged employment decision.   Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001).  If the defendant satisfies this burden, the burden shifts back to plaintiff to "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  Id.  (citations omitted).  The plaintiff cannot demonstrate that the defendant's proffered explanation is pretextual unless he shows that the defendant "was in fact motivated at least in part by the prohibited discriminatory animus." Henry, 616 F.3d at 156 (2d Cir. 2010) (citing Gordon, 232 F.3d at 117).

**1.  Plaintiff's Prima Facie Case for Retaliatory Termination and Retaliatory Denial of Overtime**

To establish a prima facie case of retaliation in violation of Title VII, the plaintiff must show that (1) he participated in a protected activity known to the defendant, (2) defendant took an adverse employment action against him, and (3) a causal connection exists between the protected activity and the adverse employment action, i.e., "that a retaliatory motive played a part in the adverse employment action."  Cifra, 252 F.3d at 216.  As stated earlier, the plaintiff's burden in making a prima facie case is de minimis.  Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001).

With regard to the first prong, "protected activity" refers to any action the plaintiff took to oppose statutorily prohibited discrimination.  See 42 U.S.C. § 2000e–3.  In showing that defendant knew about the protected activity, plaintiff need only show general corporate knowledge.  Gordon, 232 F.3d at 116.  A plaintiff's filing an internal complaint is sufficient to put an employer on notice that the plaintiff engaged in protected activity.  Everson v. N.Y. City Transit Auth., No. 2–CV–1121, 2007 WL 539159, at *27 (E.D.N.Y. Feb. 16, 2007) (citing Alston v. N.Y. City Transit Auth., 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998)).

With regard to the second prong, adverse employment actions *in the context of retaliation cases* are "those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant" — for example, employer actions that would "dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006).  In other words, Title VII's anti-retaliation provision prohibits a broader range of conduct than Title VII's anti-discrimination provision.  Id., 548 U.S. at 66.  However, filing a discrimination case "cannot immunize [an] employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  Id. at 68.

With regard to the third prong, plaintiff may show a causal connection between the protected activity and the adverse employment action either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct" or (2) "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Gordon, 232 F.3d at 117 (citing Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993)).  There is no bright-line rule for determining when retaliatory conduct

followed closely behind a plaintiff's protected activity, see Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001), but the temporal proximity must be "very close."   Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).

Plaintiff alleges two forms of retaliation.  First, plaintiff alleges that after he filed his complaints with the Museum, the Museum retaliated against him by terminating him.  Pl. Br. at 14; Pl. Decl. ¶ 16; Pl. Dep. 39:6–10; Pl.'s 56.1 ¶ 46.  Second, plaintiff alleges that after plaintiff filed the 10/9/07 Complaint, Monuszko retaliated against him by offering him little to no overtime work, whereas other employees had opportunities for significant overtime work.  Pl. Br. at 13; Pl. Decl. ¶ 9; 4/21/08 Compl.; Block Suppl. Decl. Exs. A, B.

The parties dispute whether plaintiff makes a prima facie case for his retaliation claims.

### i.  Plaintiff Shows that He Engaged in Protected Activity, and that the Museum Knew About the Protected Activity

Arguing that plaintiff did not engage in protected activity, the Museum mischaracterizes plaintiff's retaliation claims as claims that the Museum and Monuszko retaliated against him only because he complained about smoking (an activity Title VII does not protect), and not because he complained about discrimination (an activity Title VII does protect).  Def.'s Mem. Supp. Mot. Summ. J. ("Def. Br.") at 17, ECF No. 18; Def.'s 56.1 ¶¶ 64–66; Def.'s Suppl. Br. Supp. Mot. Summ. J. ("Def. Suppl. Br.") at 1–2, 4–5. ECF No. 34.  In support of this argument, the Museum cites selectively to plaintiff's pro se complaint and segments of plaintiff's deposition in which the Museum's attorney – but not plaintiff, who appeared for his deposition pro se – describes the 10/9/07 Complaint in incomplete, self-serving fashion as "the complaint about the smoking policy."  Def. Br. at 17 (citing Pl. Dep. 33:2–5, 11/22/11); see Def. Suppl. Br.

at 6 (citing to similar statements in plaintiff's deposition testimony that the Museum did not include in the record).

In so doing, the Museum ignores the substance of both the 10/9/07 Complaint and the 4/21/08 Complaint, as well as plaintiff's testimony that he was terminated because "I'm the only one complaining in the entire Building[s] Department," Pl. Dep. 39:8–10; "because I had complained about discrimination and whereas no one else in the Building[s] Department made complaints," Pl. Decl. ¶ 16; and "in retaliation for me complaining about discrimination." Id. ¶ 18.

In the 10/9/07 Complaint, plaintiff alleges not only that employees are smoking in the Plumbing Shop, but also that Monuszko has been making discriminatory comments. Making the allegations in the 10/9/07 Complaint about Monuszko's discriminatory comments was a protected activity.

Similarly, in the 4/21/08 Complaint, plaintiff alleges that Monuszko retaliated against him for filing the 10/9/07 Complaint. Filing the 4/21/08 Complaint was a protected activity insofar as the 10/9/07 Complaint included allegations about discrimination.[3]

In contrast, the record does not permit the Court to find that plaintiff's verbal complaints to Gomez were protected activities, as plaintiff provides no evidence concerning when in 2009 he complained to Gomez or what he said to Gomez.

The six grievance forms plaintiff filed in 2008 and 2009 alleging overtime deprivation present a closer question. Plaintiff does not expressly allege discrimination or retaliation in these forms. Moreover, in the latter four forms, plaintiff does not name Monuszko.

---

[3] Given the 4/21/08 Complaint's substance, the Museum misstates the facts in stating that "at no time had plaintiff alleged a causal connection between his complaint of discrimination and the assignment of overtime hours prior to his opposition to this motion." Def. Suppl. Br. at 2; see also id. at 7.

Construing the evidence in the light most favorable to plaintiff, the Court finds that filing the grievance forms was a protected activity, for two reasons.  First, given plaintiff's testimony that "Monuszko is the one who decides who is assigned overtime to work with him," Pl. Suppl. Decl. ¶ 14, plaintiff's grievances concerning overtime deprivation are effectively grievances that *Monuszko* deprived him of overtime.  See Doninger, 642 F.3d at 344 (2d Cir. 2011) (instructing courts to construe evidence in light most favorable to non-movant on summary judgment).[4] Second, plaintiff's 4/21/08 Complaint to the Museum, in which he alleges that Monuszko retaliated against him for making the 10/9/07 Complaint by depriving him of overtime assignments, contextualizes plaintiff's subsequent allegations in the grievance forms as allegations that Monuszko continued to retaliate against him in the same fashion.  Accordingly, the Court finds that filing the grievance forms was a protected activity.

Plaintiff, moreover, shows that the Museum was aware of his protected activity because plaintiff addressed his 10/9/07 Complaint and 4/21/08 Complaint to the Museum and sent copies of his grievance forms to "Management" (and, in some cases, to his Shop Steward).  6/20/10 Letter App'x F; Pl. Suppl. Decl. Ex. A; see Gordon, 232 F.3d at 116; Everson, 2007 WL 539159, at *27.

Accordingly, plaintiff satisfies the first prong of a prima facie case for both retaliatory termination and retaliatory denial of overtime.

---

[4] The Court notes that the Museum disputes the veracity of plaintiff's testimony that Monuszko had discretion concerning overtime assignments, see Noone Suppl. Decl. ¶ 11.  But regardless of whether plaintiff's allegations concerning Monuszko are true – a matter on which the Court does not here opine – making the allegations on a good-faith basis was a protected activity.

*ii.  Plaintiff Suffered the Adverse Employment Action of Termination*

The parties do not dispute that termination is an adverse employment action, or that plaintiff was terminated.  See, e.g., Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 598 n.2 (2d Cir. 2001) ("For good reason, the defendant did not dispute the fact that the plaintiff's termination was an adverse employment action.") (internal quotation marks omitted).

Accordingly, plaintiff satisfies the second prong of a prima facie case for retaliatory termination.

*iii.  Plaintiff Presents Evidence that He was Denied Overtime*

The parties do not dispute that denying an employee overtime assignments is an adverse employment action.  See Montgomery v. Chertoff, 3–CV–5387, 2007 WL 1233551, at *12 (E.D.N.Y. Apr. 25, 2007) ("Not being assigned overtime can result in a material loss of pay and may be considered an adverse act.") (citing Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006)); Everson, 2007 WL 539159, at *30 (citing Perez v. Con. Edison Corp. of N.Y., No. 2–CV–2832, 2006 WL 2707316, at *13 (S.D.N.Y. Sept. 20, 2006) (finding that plaintiff's temporary transfer to work site in different location was adverse action because transfer caused plaintiff to lose shift differential and overtime pay)).

Plaintiff's evidence that he was denied overtime consists of (1) statements he makes in his declarations and (2) copies of the 10/9/07 Complaint, the 4/21/08 Complaint, and his six grievance forms.

"An affidavit or declaration used to . . . oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. Proc. 56(c)(4).  For a court to consider an affidavit opposing summary judgment, "an implicit or

explicit showing that the affiant is prepared to testify in a manner consistent with an affidavit is required." Santos v. Murdock, 243 F.3d 681, 684 (2d Cir. 2001).  Even if an affidavit or declaration would not be admissible at trial, "a court may consider it on a summary judgment motion if it is based on personal knowledge and sets forth facts to which the declarant could testify at trial and that would be admissible in evidence." Schaghticoke Tribal Nation v. Kempthorne, 587 F. Supp. 2d 389, 396 (D. Conn. 2008).

Similarly, a court deciding a summary judgment motion can consider hearsay upon "a showing that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985); see also Savage v. Scripto-Tokai Corp., 266 F. Supp. 2d 344, 351 (D. Conn. 2003) ("[T]here is no basis to doubt that plaintiff[] will be able to present this evidence in admissible form at trial . . . .") (citation omitted).

In his declaration, plaintiff recounts, on the basis of personal knowledge, that he filed the 4/21/08 Complaint,

> which described how after I made the [10/9/07 Complaint] Mr.
> Monuszko had   treated me differently than the other employees in
> the plumbing shop.  For example, he offered me little to no
> overtime whereas other employees had the opportunity for
> significant overtime and Mr. Monuszko also assigned himself
> significant overtime.

Pl. Decl. ¶ 9.

Plaintiff also states in his declaration that he was "continually denied overtime . . . up to about my termination date" and that he filed grievances "about the denial of overtime," some of which he annexes.  Pl. Suppl. Decl. ¶¶ 13–14, Ex. A.  This evidence is more specific as to when plaintiff alleges the final instance of overtime deprivation occurred.

Finally, plaintiff states in his declaration that "Mr. Monuszko is the one who decides who is assigned overtime to work with him.  There is no[] []one else who makes the decision. . . . I

know that because I was there when overtime was scheduled, almost on a daily basis."  Pl. Suppl. Decl. ¶ 18.

The statements plaintiff makes in his declarations do not include details about particular instances of overtime denial, and the 4/21/08 Complaint and grievance forms plaintiff filed are hearsay.  Presumably, however, plaintiff could testify at trial in a manner consistent with many of the allegations he makes in the 4/21/08 Complaint and the grievance forms.  Moreover, the 4/21/08 Complaint and the grievance forms would likely be admissible as plaintiff's recorded recollections or the Museum's business records.   See Salerno v. City Univ. of N.Y., No. 99–CV–11151, 2003 WL 22170609, at *2 n.5 (S.D.N.Y. Sept. 18, 2009) (considering on summary judgment a letter plaintiff wrote because, were plaintiff to testify at trial, she would presumably recall events the letter alleged, and if not, letter would be admissible under "recorded recollection" exception to the hearsay rule) (citing Fed. R. Evid. 803(5)).

The Museum does not argue that plaintiff actually worked overtime on the dates in question.[5]

Accordingly, plaintiff satisfies the second prong of a prima facie case for retaliatory denial of overtime.

### iv.  Plaintiff Presents Evidence of a Causal Connection Between His Protected Activities and His Termination

If making the 4/21/08 Complaint were plaintiff's final protected activity, the Court would find that plaintiff's June 2009 termination was too temporally remote from plaintiff's protected activity to establish a causal connection.  See Butler v. Raytel Med. Corp., 98–CV–6446, 2004 WL 1961522, at *4 (E.D.N.Y. Aug. 24, 2004) (finding no causation where one year elapsed between protected activity and adverse action); Lambert v. N.Y. State Office of Mental Health,

---

[5] The Museum does, however, dispute that the overtime denial violated Title VII.  See Part II(C)(3), infra.

97–CV–1347, 2000 WL 574193, at *13 (E.D.N.Y. Apr. 24, 2000) (finding no causation where five months elapsed between protected activity and adverse action); Cabian v. N.Y. City, 99–CV–10533, 2000 WL 1782744, at *18 (S.D.N.Y. Dec. 6, 2000) (finding no causation where over four months elapsed between protected activity and adverse action).

But plaintiff engaged in subsequent protected activity by filing the grievance forms concerning overtime deprivation, the last two of which he filed on May 19, 2009 (within a month of his termination) and June 6, 2009 (within days of his termination). See Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996) (inferring causation when twelve days elapsed between protected activity and adverse action); Part II(C)(1)(i), supra. Accordingly, plaintiff shows a sufficiently close temporal connection between his protected activity and his termination for the Court to infer causation.

Plaintiff presents no other evidence of an indirect causal connection between his protected activity and his termination, such as evidence that the Museum treated him differently from fellow employees who engaged in similar protected conduct. Nor does plaintiff present any direct evidence that the Museum harbored retaliatory animus toward him. In fact, the record contradicts any such claim. See McDowell Decl. ¶ 25; Pl.'s 56.1 ¶ 45.

Nevertheless, plaintiff satisfies the third prong of a prima facie case for retaliatory termination because he shows such close temporal proximity between his protected activity and his termination.

> v.   *Plaintiff Presents Evidence of a Causal Connection Between His Protected Activities and the Alleged Overtime Deprivation*

In his 4/21/08 Complaint, plaintiff alleges that after he filed the 10/9/07 Complaint, Monuszko deprived him of overtime work on October 18, 2007; January 7, 2008; February 2, 2008; and April 16, 2008. 4/21/08 Compl.

36

The nine-day proximity between the plaintiff's filing the 10/9/07 Complaint and the first date on which plaintiff alleges Monuszko deprived him of overtime is so close as to suggest a causal connection between these two events.  Further, the record suggests a continuing pattern of overtime denial on at least ten more occasions (on January 7, 2008; February 2, 2008; April 16, 2008; May 31, 2008; June 22, 2008; November 4, 2008; November 11, 2008; January 19, 2009; May 16, 2009; and June 7, 2009) before plaintiff's termination.  More specifically, the record reflects that on several occasions, plaintiff reported, shortly after making a protected complaint about overtime deprivation, that he had again been deprived of overtime.  For example, within six weeks of filing his 4/21/08 Complaint, plaintiff filed a grievance that he was deprived of overtime again on May 31, 2008; within a month of filing this grievance about May 31, 2008, plaintiff filed a grievance that he was deprived of overtime on June 22, 2008; and within a month of filing a grievance that he was deprived of overtime on May 16, 2009, plaintiff filed a grievance that he was deprived of overtime on June 7, 2009.

Given this temporal proximity, plaintiff satisfies the third prong of a prima facie case for retaliatory overtime deprivation.

### 2.   The Museum Articulates a Legitimate, Non-Discriminatory Motive for Terminating Plaintiff, and Plaintiff Offers No Evidence that the Museum's Explanation is a Pretext for Retaliatory Termination

As explained above, the Museum presents a legitimate, non-retaliatory motive for terminating plaintiff.  See Part II(B)(2), supra.

Plaintiff alleges that the Union "combined the [Plumbing and Plaza Pool] shops in order to mask retaliatory intent." Pl.'s 56.1 ¶ 46.  But plaintiff does not argue or prove that contesting the Shop Steward election on March 3, 2009 was a protected activity.  More importantly, even if it were true that the Union insisted on subsuming the Plaza Pool in the Plumbing Shop, and

thereby firing both plaintiff and Kletzky, simply to retaliate against plaintiff, plaintiff provides no evidence to support an allegation that the *Museum* subsumed the Plaza Pool Shop in the Plumbing Shop to mask retaliatory intent.

Nor does plaintiff present any other evidence that the Museum's proffered, non-retaliatory reason for terminating him is pretextual.  See Part II(B)(2), supra.

Accordingly, no genuine issue of material fact exists as to whether the Museum terminated plaintiff in retaliation for his protected activities, and the Museum is entitled to summary judgment on plaintiff's claim for retaliatory termination.

### 3. Genuine Issues of Material Fact Remain Concerning Whether the Museum Had a Legitimate, Non-Discriminatory Motive for Denying Plaintiff Overtime

The Museum presents evidence that although Monuszko was "tasked with administering the overtime allocation, he had absolutely no discretion to decide to whom the overtime hours were allocated."  Noone Suppl. Decl. ¶ 11.  Rather, the Museum argues, "past practice" bound Monuszko, when overtime opportunities arose, to (1) seek volunteers from among the Plumbing Shop employees who were already at the Museum and not otherwise scheduled to work when the overtime work needed to be done; and (2) when the number of volunteers exceeded the number of available overtime slots, to assign the overtime work to the person with the fewest overtime hours.  Id. ¶¶ 8–10.  This evidence suggests that Monuszko made the overtime assignments in the Plumbing Shop on a purely formulaic, rather than discretionary, basis.

The Museum also presents evidence, which plaintiff concedes, that "[m]ost of the need for overtime" arises at the end of the 8:00 AM to 4:00 PM shift, whereas plaintiff worked from 1:00 PM to 9:00 PM, except for a brief period before December 4, 2007, when he worked from 3:00 PM to 11:00 PM.  Id. ¶¶ 3–5; Def.'s Suppl. 56.1 ¶¶ 1–6.  Therefore, the Museum implies, plaintiff was ineligible for most overtime assignments.

But the Museum presents no evidence concerning (1) what happened on particular dates when plaintiff alleges he was denied overtime, (2) how the Museum responded to the 4/21/08 Complaint, or (3) how the Museum responded to the grievance forms plaintiff filed alleging that he was deprived of overtime on November 4 and 8, 2008, January 19, 2009, May 16, 2009, and June 7, 2009.  The only evidence the Museum presents concerning anybody's response to any of plaintiff's grievance forms is Gomez's handwritten statement that each of plaintiff's first two grievance forms "IS DENIED AFTER BEING INSTRUCTED BY MANAGEMENT THAT THE UNION IS NOT RECOGNIZING THIS FORM AND THAT IT SHOULD BE CONSIDERED FRIVOLOUS."  6/20/10 Letter App'x F.  Gomez's statement does not explain why the Union refused to recognize the forms or why plaintiff's grievances were frivolous. While Gomez may have disposed of plaintiff's grievances as he did because plaintiff was not eligible for the overtime work, the Museum provides no evidence to that effect.

These omissions in the Museum's evidence, along with the contradictory statements in the record concerning whether Monuszko had discretion in assigning overtime work, show that genuine issues of material fact remain concerning whether plaintiff was eligible for the overtime assignments he was denied and whether Monuszko's overtime allocations were discretionary or purely automatic.

Accordingly, plaintiff's claim for retaliatory denial of overtime is not ripe for summary judgment.[6]

---

[6] The Museum argues incorrectly that plaintiff's claim for retaliatory overtime deprivation is time-barred because "according to [plaintiff's] submission," November 11, 2008 is "the last time [plaintiff] was denied overtime," and plaintiff complained to the EEOC about overtime deprivation more than 300 days later.  Def. Suppl. Br. at 5.  On the contrary, the parties' supplemental submissions reflect that June 7, 2009 is the last time plaintiff was denied overtime, and plaintiff complained  to the EEOC about overtime deprivation in his 10/16/09 Letter.  Accordingly, plaintiff's claim for retaliatory overtime deprivation is not time-barred.

**D.  Plaintiff's Claim that the Museum Breached the CBA**

Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), governs the employer's duty to honor the CBA, and Section 9(a) of the NLRA, 29 U.S.C. § 159(a), implies that unions have a duty of fair representation.  White v. White Rose Food, 237 F.3d 174, 179 n.3 (2d Cir. 2001).

Plaintiff alleges that the Museum breached the CBA by terminating him, Compl. ¶¶ 8–9, and by hiring three new Buildings Department employees within six months of terminating him. Pl. Decl. ¶ 22; Karlin Decl. Ex. 6; Pl. Br. at 8.

Plaintiff's claim is a "hybrid § 301/fair representation claim."  Jourdain v. Serv. Employees Int'l Union Local 1199, No. 9–CV–1942, 2010 WL 3069965, at *3 (S.D.N.Y. July 28, 2010) (internal quotation marks omitted).  In making such a hybrid claim, plaintiff "may sue the union or the employer, or both, but must allege violations on the part of both."  Commodari v. Long Island Univ., 89 F. Supp. 2d 353, 365 (E.D.N.Y. 2000) (citations omitted), aff'd, 62 Fed. App'x 28 (2003).  Further, plaintiff must prove "both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation."  White Rose Food, 237 F.3d at 178.  Failure to prove both that the Union breached its duty of fair representation and that the Museum breached the CBA "dooms" a hybrid claim.  Musto v. Transport Workers Union of Am., 818 F. Supp. 2d 621, 632 (E.D.N.Y. 2011); see also Jourdain, 2010 WL 3069965, at *5 ("[T]he Union's breach is a prerequisite to consideration of the merits of [plaintiff's] claim against [his] former employer.") (quoting Young v. U.S. Postal Serv., 907 F.2d 305, 307 (2d Cir. 1990) (internal citations omitted)).

### 1.  The Union Did Not Breach Its Duty of Fair Representation

A union has a duty to fairly represent all employees subject to the CBA.  <u>Musto</u>, 818 F. Supp. 2d at 634.  This duty includes negotiating, enforcing, and administering the CBA, <u>id.</u>, and "fair and prompt consideration and, if dictated by controlling legal standards, processing on behalf of employees of their claims under contract dispute resolution procedures."  <u>Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers</u>, 34 F.3d 1148, 1153 (2d Cir. 1994) (quoting <u>Ames v. Westinghouse Elec. Corp.</u>, 864 F.2d 289, 293 (3d Cir. 1998)).

A union breaches its duty of fair representation if its actions "can fairly be characterized as so far outside a wide range of reasonableness . . . that [they are] wholly arbitrary, discriminatory, or in bad faith."  <u>Spellacy v. Airline Pilots Ass'n–Int'l</u>, 156 F.3d 120, 126 (2d Cir. 1998) (quoting <u>Air Line Pilots Ass'n v. O'Neill</u>, 499 U.S. 65, 78 (1991)) (internal quotation marks omitted).

A union's conduct is arbitrary only "when it is without a rational basis or explanation." <u>Musto</u>, 818 F. Supp. 2d at 634 (quoting <u>Marquez v. Screen Actors Guild, Inc.</u>, 525 U.S. 33, 46 (1998)).  A union has a "wide range of reasonableness" within which it may lawfully act, which "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong."  <u>Id.</u> (quoting <u>Marquez</u>, 525 U.S. at 45–46).  Several courts have noted "the need for deference to union decision-making."  <u>Balestracci v. Gen. Dynamics Corp.</u>, 221 F. Supp. 2d 258, 267 (D. Conn. 2002) (citing <u>White Rose Food</u>, 237 F.3d at 180); <u>see also</u> <u>Commodari</u>, 89 F. Supp. 2d at 371 ("judicial review of union action must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.") (quoting <u>Gvozdenovic v. United Air Lins, Inc.</u>, 933 F.2d 1100, 1106 (2d Cir. 1991)) (internal quotation marks omitted).

41

The duty of fair representation "is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." Cruz, 34 F.3d at 1153–54 (quoting Ryan v. N.Y. Newspaper Printing, 590 F.2d 451, 455 (2d Cir. 1979)).  In contrast, a union breaches the duty when it engages in deliberate, hostile conduct, Musto, 818 F. Supp. 2d at 635 (citing Amalgamated Ass'n of Motor Coach Employees v. Lockridge, 403 U.S. 274, 301 (1971)), or when its "acts of omission . . . , while not calculated to harm union members," are "so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." Balestracci, 221 F. Supp. 2d at 266 (quoting NLRB v. Local 282, IBT, 740 F.2d 141, 147 (2d Cir. 1984)) (citations and internal quotation marks omitted)).

A union's conduct is discriminatory when the union "takes actions favoring some of its members at the expense of others[,] without a legitimate purpose," "for arbitrary or invidious reasons." Musto, 818 F. Supp. 2d at 635 (citations omitted).  "While a union may make seniority decisions within a wide range of reasonableness in serving the interests of the unit it represents, such decisions may not be made solely for the benefit of a stronger, more politically favored group over a minority group." Id. (quoting Barton Brands Ltd. V. NLRB, 529 F.2d 793, 798–99 (7th Cir. 1976)) (citation and internal quotation marks omitted).

A union acts in bad faith when it engages in fraud, dishonesty, or other intentionally misleading conduct.  Spellacy, 156 F.3d at 126; see also Sim v. N.Y. Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir. 1999) ("Bad faith requires a showing of fraudulent, deceitful, or dishonest action.") (citing Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 531 (10th Cir. 1992)).

A union's CBA interpretation "should be afforded great deference."  Morris v. Local 819, Int'l Bhd. of Teamsters, 954 F. Supp. 573, 580 (E.D.N.Y. 1997).  "In the context of interpreting

provisions of a CBA, a court may find that a union's interpretation . . . was reasonable as a matter of law, even if the court disagrees with" the union's interpretation, "so long as the union['] s actions were not so far outside a wide range of reasonableness as to constitute irrational or arbitrary conduct."  Musto, 818 F. Supp. 2d at 635 (internal quotation marks omitted).  "To uphold the union's action in interpreting the contract . . . , [the court's] inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the [plaintiff's] claim in light of the language" of the CBA.  Spellacy, 156 F.3d at 127 (quoting Tedford v. Peabody Coal Co., 533 F.2d 952, 957 (5th Cir. 1976)) (internal quotation marks omitted).

Plaintiff alleges that the Union breached its duty of fair representation by declining to initiate grievance procedures when the Museum terminated him.  Pl. Br. at 10.  While plaintiff does not expressly argue that the Union acted arbitrarily, his assertion that the Union deviated from the plain language of the CBA suggests that he means to make such an argument.  See id. at 9, 11.  Plaintiff also argues that the Union acted in bad faith by retaliating against him for contesting the Shop Steward election.  Id. 11.

The CBA provision on which plaintiff bases his claim provides:

> In the event of any layoffs of employees due to a reduction of staff, those employees within the particular department, i.e., the Security Department, the Buildings Department on in the title of Departmental Technician, Senior Departmental Technician, who were hired last shall be laid off first, and rehiring shall be in reverse order within the particular department or title.

CBA Art. XV(2).

The Union and the Museum interpreted this provision to mean that the Museum must consider seniority within the Security Department separately from seniority within the Buildings Department.  See Def. Br. at 23.  The Union and the Museum viewed this interpretation as

consistent with Section 9(b) of the NLRA, which prohibits the NLRB from certifying a bargaining unit that consists of both guards and non-guards.  29 U.S.C. § 159(b); Def's Repl. Mem. Supp. Mot. Summ. J. ("Def. Repl. Br.") at 9, ECF No. 30.

Further, the Union and the Museum did not interpret the CBA as requiring the Museum to compromise its operations by eliminating the most junior employees in the entire Buildings Department regardless of what services the Museum needed most.  Def. Repl. Br. at 10; see 6/21/09 Letter.  For these reasons, the Union and the Museum concluded that terminating plaintiff and Kletzky conformed with the CBA.  6/21/09 Letter.

Affording this interpretation deference, see Morris, 954 F. Supp. at 580, the Court finds that the interpretation is reasonable as a matter of law because it is not so far outside a wide range of reasonableness as to be irrational or arbitrary.  See Musto, 818 F. Supp. 2d at 635.  The CBA requires that in the event of layoffs, the Museum shall terminate employees "within" the Buildings Department in order of reverse seniority.  CBA Art. XV(2).  The CBA neither requires nor prohibits making these reverse seniority determinations by Buildings Department shop. Furthermore, the Union and the Museum adopted the interpretation they thought made most sense given the Buildings Department's size, the differences between the specialized skills each shop required, and the Museum's needs.[7]  Accordingly, the Union made an informed, reasoned judgment, in light of the CBA's language, that plaintiff's grievance concerning his termination lacked merit; the Union did not act arbitrarily.  See Spellacy, 156 F.3d at 127; 6/21/09 Letter.

Nor does the record contain any evidence that the Union acted in bad faith.  Plaintiff suggests that because he contested the Shop Steward election on March 3, 2009, the Union

---

[7] In dismissing the unfair labor practice charge plaintiff filed with NLRB Region 2, the NLRB found that the Union had deemed plaintiff's layoff proper while negotiating with the Museum "according to the bargaining history and past practice between the [Museum] and the Union."  10/30/09 Letter.  Because the record contains no evidence concerning such "past practice," the Court cannot determine whether past practice constitutes yet another reason to find that the Union and the Museum interpreted the CBA reasonably.

44

refused to grieve plaintiff's termination in June 2009.  Pl. Br. at 9, 11.  However, plaintiff provides no evidence concerning how the Union responded to his election challenge or whether anybody at the Union said or did anything between March 3, 2009 and his termination to make him believe that anybody at the Union resented his election challenge.  Further, plaintiff ignores that the Union's position during layoff negotiations with the Museum affected Kletzky too; plaintiff provides no evidence that the Union advocated sacrificing Kletzky solely to eliminate plaintiff.  In sum, plaintiff presents no evidence that the Union engaged in fraud, dishonesty, or other intentionally misleading conduct with an improper intent or motive.  See Spellacy, 156 F.3d at 126.  Accordingly, the Court cannot find that the Union acted in bad faith by refusing to grieve plaintiff's termination.

Because plaintiff fails to show that the Union's decision not to grieve his termination was arbitrary, discriminatory, or in bad faith, he fails to show that the Union breached its duty of fair representation.  As a result, plaintiff's claim that the Museum breached the CBA fails as a matter of law.

### 2.  The Museum Did Not Breach the CBA

As an initial matter, the claim for breach of contract fails because plaintiff does not show that the Union breached its duty of fair representation.  See White Rose Food, 237 F.3d at 178; Part II(D)(I), supra.  Additionally, plaintiff's claim that the Museum violated his seniority rights under the CBA by terminating him fails because the CBA entitles the Museum to assess relative seniority by shop.  See Part II(D)(1), supra.  Finally, plaintiff's claim that the Museum violated his reinstatement rights under the CBA fails because the record reflects that the Museum did not replace plaintiff.  See Part II(B)(1)(ii), supra.

45

## **<u>CONCLUSION</u>**

The Museum's motion for summary judgment is granted as to plaintiff's claims of discrimination in violation of Title VII, retaliatory termination in violation of Title VII, and breach of the CBA, but denied as to plaintiff's claim of retaliatory deprivation of overtime work in violation of Title VII.


**SO ORDERED.**

Dated: March 21, 2013
      Brooklyn, New York

                                      _____/s/_____
                                      *JOAN M. AZRACK*
                                      *UNITED STATES MAGISTRATE JUDGE*